## MULKINS *v.* MULKINS.

DIVORCE — EXTREME CRUELTY — EVIDENCE—GENERALITIES INSUFFICIENT.

In a suit by a wife for divorce on the ground of extreme cruelty, where her charges consisted largely of generalities, and the three specific instances testified to by her were insufficient to establish the charge, the court below properly dismissed the bill.

Appeal from Ingham; Collingwood (Charles B.), J. Submitted April 7, 1921.   (Docket No. 35.)   Decided October 3, 1921.

Bill by Flossie B. Mulkins against Jesse Mulkins for a divorce.   From a decree dismissing the bill, plaintiff appeals.   Affirmed.

Authorities discussing the question of cruelty as grounds for divorce are collated in notes in 18 L. R. A. (N. S.) 300; 34 L. R. A. (N. S.) 360.

*Jason E. Nichols*, for plaintiff.

*Cummins & Nichols*, for defendant.

STEERE, C. J. As grounds for divorce plaintiff charges in her bill of complaint that during their married life defendant was guilty of repeated and extreme cruelty to her directly and also by consorting with lewd women. Upon the hearing she offered no evidence to sustain the latter charge, which was manifestly abandoned. No acts of personal violence are charged or claimed. Defendant's answer makes direct denial of all her charges of misconduct, with no recriminating allegations, and asks dismissal of her bill of complaint. The case was heard in the Ingham county circuit court, in chancery, on pleadings and proofs taken in open court, resulting in denial of divorce and dismissal of plaintiff's bill. She urges on appeal that her evidence establishing the essential facts of repeated and extreme cruelty is unimpeached and practically undisputed, which entitled her of legal right to the relief asked, and the trial court erred in arbitrarily ignoring the same.

The parties to this suit were married in the city of Mason, Ingham county, on June 1, 1910. Plaintiff was then about 18 years of age and defendant 6 years older. No special disparity is shown in their condition in life, educational attainments or social rank. He was a laboring man, a tenant farmer in the vicinity of Mason, where she lived with her mother who was a widow with seven children in indicated modest circumstances. Their married life while together was spent on farms near Mason which he worked as a tenant, the last four years upon the so-called Alfred Clark farm from where she left him on March 12, 1920. In the communities where they lived together and were known they apparently acquired a respectable standing. None of their former neighbors

criticized their characters or domestic relations, or spoke ill of them. They are shown to have participated in the social events of their communities, especially dances, which, as plaintiff tells it, seem to have particularly furnished the forum for defendant's acts of extreme cruelty. Defendant is shown to have been a hard working farmer, attentive to his home and business, who provided well for his wife according to their circumstances. Aside from the charges of abusive language and imputations of infidelity, which he denies, plaintiff testifies to no grievance of significance against her husband. On cross-examination she replied:

"I have no positive evidence he was with other women. Mr. Mulkins has worked hard; so far as I know he has been attentive to business. He supported me as well as most tenant farmer support their wives."

Alfred Clark, an apparently disinterested witness who owned the farm upon which they spent the last 4 years of their married life together and who spoke kindly of both, stated he was at their home and around the premises considerably while they were there; that plaintiff at first had a horse and buggy and later an automobile to drive and they had a "comfortable home as renters;" told of defendant cheerfully leaving his work at fixing fence a half mile from home to hitch up the horse for his wife, noted that she seemed to be away from home "quite a lot" but he couldn't say how much, regarded defendant as an industrious, hard working man, and thought he treated his wife "well as any man."

Plaintiff's grounds of divorce, which she stated strongest in general terms without specifications, can perhaps best be outlined in her own language at commencement of her direct-examination as follows:

"He was always accusing me of things I was not guilty of, I took it he was jealous. He said he was

not but I never went to town or anywhere but what I was accused of doing something wrong. He kept up those groundless accusations until our final separation. He was that way all through our married life. It was never one person but every man that looked at me. He was always thinking of something wrong. He never had any occasion for accusing me wrongfully as he did do."

As the law is not satisfied with generalizations, evidence of specific facts and circumstances was essential to establish her case, and she was particularly interrogated along that line by her own and defendant's counsel. While most ready with her accusing generalizations, she was able to recall and relate but three claimed instances of extreme cruelty during the ten years they lived together, two of which are charged in her bill of complaint, and called by her "about the two worst occasions." Both took place over two years before she left her husband, at dances which they attended, one in the Onondaga town hall and one at Tompkins Center. Defendant denies her version of those events, as to which she has the burden of proof, but even as she tells them his language, while reprehensible, does not accuse her of any act of immorality. They went to the Onondaga dance with her aunt and uncle. His charged extreme cruelty on that occasion arose over her not waiting his return from getting shaved to give him the customary first dance due to an escort and he found her dancing with others when he arrived. He was displeased about it and admittedly belittled himself by his angry reproaches. She testified he swore aloud at her in the presence of others who heard him, including her uncle and aunt. None of them gave evidence to support this charge. He admitted the incident but denied swearing at his wife; said he "was mad about it and told her I wouldn't play second fiddle

to anybody." Asked to repeat what he said that night
she replied:

"Well, he said he wasn't going to be second and
cursed and swore at me * * * he swore at me
and said I was out of my place and doing things I
should not do."

What he said as she relates it did not charge her
with any immoral conduct. Taken at its worst his
profane and foolish outbursts over her ignoring his
claimed prerogative soon blew over and was apparently
not then regarded by either as of serious significance.
He soon dropped the subject and participated with
her and others in the festivities of the dance, until
it was over, so far as disclosed. They thereafter
lived and went to dances together as before for two
years or more.

The Tompkins Center dance incident was a similar
manifestation by him of silly irritation with an in-
dicated jealous impulse over the attentions shown his
wife by two young men he had not met, who were
introduced to her by friends and danced with her.
His vulgar reflections to her on their conduct as she
tells them were reprehensible in the extreme, but
were directed against them and did not charge her
with any infidelity or improper conduct, or even with
relegating him to second fiddle.

The third and last specific act of extreme cruelty
while they lived together which she relates as the
culminating affront shortly before she left him in-
volved his treatment of her in the presence of her
mother. They at that time had an automobile which
she drove and was away with it during the day. She
tells the story as follows:

"He was drawing beans for Mr. Weaver. He told
me to call for him at Weaver's about 5 o'clock. So
I took the machine and took Mrs. Weaver down to
mother's in Mason. Then got back to Weaver's a

little after 5 and he comes out to the machine.  We had the curtains on and he didn't know mother was in there on the back seat and he says, 'Where in hell have you been ramming around all the afternoon. I thought you would be here after me,' and those were his words and I was innocent of wrong."

Defendant does not deny this charge, but seeks to excuse the incivility on the ground he was annoyed by the long wait and did not know his mother-in-law was there, to whom he attempted to excuse himself. The mother-in-law said his remarks made her feel bad as she thought he was mad because she was there, but he did not see her when he said it, that then she cried and when he saw her he said "don't feel hard because I didn't mean it."

Defendant appears to have been on friendly terms with his mother-in-law, who speaks kindly of him but gives a tragic account of how he "lost his head" in one of his frantic efforts to get his wife back after she left him, in part as follows:

"He went to Jackson to work and he came back and kept begging Flossie to live with him.  When she told him she would not live with him he stooped down to his suit case and opened it and took out a razor and she jumped and grabbed him.  She says, 'for God's sake don't do that.'  And I says, 'Jesse, if you are going to take your own life or ours for God's sake don't do it in my house.'  She grabbed the razor and dropped it into an open drawer and ran out doors for fear he would attempt his life.  We got her back in the house and he went into all shapes you can imagine. She was frightened and he would call us, and threw himself in all shapes you ever saw, and showed himself and then I says, 'Jesse, help me, help me to get this girl up before she dies.'  And he took her in his arms and helped me to bring her to.  Then I says, 'What were you going to do with that razor?'  And he says, 'My God, mother, I have lost my head, what will I do?  I have lost my head.'  That is just what he said to me and he knows he did it and I didn't

know what to do.   I never saw—Jess never got out of temper, never misused her in the world but once outside this occurrence and that was the time she was telling you what took place in the automobile."

From this it appears that plaintiff's own mother when called by her as a witness against defendant gives him a clean sheet for conjugal kindness to her daughter during the ten years they lived together with the one exception of getting mad and scolding her in rather ungentlemanly language because she kept him waiting for her at a neighbor's after his day's work longer than he liked.   The significance of her narrative of his losing his head in an ill-starred theatrical demonstration with a razor when his wife refused his appeal for her to return and live with him again, rests in the fact she is not shown to have been alarmed for her own safety but "ran out of doors for fear he would attempt his life" after dropping the razor into a conveniently open drawer readily available to him had he really meant business with it; but he promptly acceded to his mother-in-law's request to refrain from killing himself or anybody else in her house, helped her get his wife back into the house and in response to further appeal "took her in his arms and helped bring her to," instead of helping her to widowhood according to his original program, as his demonstrations had led her to anticipate.   Though perhaps disappointing, his conduct on that occasion cannot be legally classed as extreme cruelty.

Aside from her story of these specific instances before she left him, and another coarse demonstration of anger and jealousy at a dance after she had refused to live with him and then excused herself from accepting his request for a dance, in which his profanity was directed against a man with whom he thought she danced too often, her case rests on her sweeping generalities.   No testimony is given by any other witness

legally approximating acts of extreme cruelty by him, and there is testimony by other witnesses that he was indulgent, used her well and was especially attentive and kind to her when sick.

Other matters in the case from which it is claimed inferences may be drawn and motives inferred need not be discussed. The learned circuit judge who originally heard the case had these parties and their witnesses before him with direct opportunity to see and hear them, observe their manner of testifying, apparent candor or lack of candor and other possible aiding incidents to correct conclusions from oral testimony not always apparent from the printed page. A careful review of this record leads us to like conclusions and we find no occasion to disturb the decision appealed from.

The decree dismissing plaintiff's bill of complaint is affirmed, without costs.

MOORE, WIEST, FELLOWS, STONE, CLARK, BIRD, and SHARPE, JJ., concurred.